**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

LAWANDA J. VALENTINE-WILLIAMS,

Plaintiff,

v.

CITY OF OMAHA, NEBRASKA, MATTHEW A. RECH, DARRELLE F. BONAM, ANGELA M. LYDON, MOLLY TALBITZER, HEIDI SCHLOTZHAUER, JUSTIN KNAPP, KEVIN SLIMP, MAKAYLA DANNER, and JANE and JOHN DOES 1-10,

Defendants.

**Case No. 8:24-cv-165**

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff LaWanda J. Valentine-Williams ("LaWanda") submits this Brief in Opposition to the Motion for Summary Judgment filed by Defendants Matthew A. Rech ("Rech"), Darrelle F. Bonam ("Bonam"), Angela M. Lydon ("Lydon"), Molly Talbitzer ("Talbitzer"), Heidi Schlotzhauer ("Schlotzhauer"), Justin Knapp ("Knapp") (collectively, "the OPD Officers"), and the City of Omaha ("the City") (together, "the City Defendants"). (Doc. 95).

## INTRODUCTION

The City Defendants' Motion rests on a "protective sweep" that no Omaha Police Department policy authorized and no law permitted. The OPD Officers had no arrest warrant and no search warrant. They had no consent. The only suspect

had been arrested outside and was locked in a cruiser. The OPD Officers were never lawfully inside LaWanda's home, so there was no in-home arrest to which a sweep could be incident. A protective sweep exists only as an adjunct to a lawful in-home arrest. *Maryland v. Buie*, 494 U.S. 325, 327, 337, 110 S. Ct. 1093, 1094, 1099, 108 L. Ed. 2d 276 (1990). Nebraska courts told Omaha officers more than thirty years ago that officers who were "never lawfully within the home" cannot conduct one. *State v. Farber*, 1 Neb. App. 460, 466, 498 N.W.2d 797, 802 (1993).

LaWanda's police practices expert, retired police chief Thomas J. Tiderington ("Tiderington"), reached the same conclusion. Drawing on forty-four years in law enforcement, twenty of them as a chief of police, he concluded that a reasonably trained officer "would not have entered the residence or conducted a protective sweep prior to the issuance of a court ordered and authorized warrant to search," and that LaWanda's insistence on a warrant did not give the OPD Officers probable cause to arrest her. (Doc. 101-1, Pg. 6, 24, 33). The City Defendants offer no expert testimony to rebut him.

OPD officially tells its officers the same thing. OPD's own policies prohibit "a warrantless and nonconsensual entry into a private residence" absent an exception to the warrant requirement, and they direct that "[o]fficers will obtain a search warrant whenever time and circumstances permit." (Doc. 92-2, Pg. 32 | Doc. 98-5, Pg. 76:2-14). OPD's policies contain no protective sweep exception.

(Doc. 98-5, Pg. 71:11 - 72:1, 75:12-21). The only provision that authorizes officers to look through a home for persons applies after a search warrant has been obtained. (Doc. 101-4, Pg. 36:20 - 37:16). Rech, the sergeant who ordered the entry, could not identify any policy that authorized what he did. (Doc. 101-4, Pg. 39:18 - 41:1).

Rech ordered the entry anyway. In his words, the sweep was "in lieu of a court-authorized warrant." (Doc. 101-4, Pg. 42:11-16). When LaWanda insisted on a warrant, Rech had her arrested: "In the end she believed that we couldn't go into her home without a warrant. That was the end of it. And once I couldn't get past that, I said, you're under arrest for obstructing." (Doc. 101-4, Pg. 18:9-13). Rech then decided the charge, and LaWanda was booked, jailed, and forced to post bond before the charge was dismissed. (Doc. 98-4, Pg. 71:22 - 72:24 | Doc. 101-2, Pg. 74:7-19 | Doc. 101-4, Pg. 23:4-12, 33:7-10).

The City Defendants' brief does not engage with its own policies, admissions, testimony, or the law. Instead, Defendants try to retroactively justify events they caused by acting without a warrant. The City Defendants rely upon body camera timestamps describing LaWanda "push[ing]" toward her own front door. (Doc. 96, ¶¶ 19, 26). Yet, the officer standing at that door testified that LaWanda never put her hands on her and did not push her. (Doc. 101-3, Pg. 33:4 - 34:16). No officer claims LaWanda threatened anyone. (Doc. 98-4, Pg. 57:5-10 |

Doc. 101-3, Pg. 22:11-16, 34:17-20 | Doc. 101-4, Pg. 21:13-15 | Doc. 101-5, Pg. 30:8-12). The Motion should be denied as to Counts I, II, III, IV, and V and as to the City's liability under *Monell*.

## STANDARD OF REVIEW

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986). Courts "may not resolve genuine disputes of fact in favor of the party seeking summary judgment," including on qualified immunity. *Tolan v. Cotton*, 572 U.S. 650, 656-57, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014). "To decide whether an official is entitled to qualified immunity, we conduct a two-step inquiry: (1) whether the facts, viewed in the light most favorable to the plaintiff, demonstrate a constitutional or statutory deprivation; and (2) whether the right was clearly established at the time." *Nieters v. Holtan*, 83 F.4th 1099, 1105 (8th Cir. 2023).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776,

167 L. Ed. 2d 686 (2007). LaWanda's account is corroborated by the City Defendants' own witnesses. The City Defendants' account is refuted by their own policies, records, testimony, and admissions. The City Defendants are not entitled to summary judgment.

## SUMMARY OF MATERIAL FACTS

The facts are set out in LaWanda's Response to the Defendants' Statement of Material Facts and Statement of Additional Material Facts, filed contemporaneously. In summary:

On May 12, 2021, Marilyn Brown reported that LaWanda's adult son, Rico Valentine ("Rico"), had pointed a handgun at her outside LaWanda's home at 3726 North 40th Street ("the Home") and gone inside. (Doc. 98-6, Pg. 2). When officers arrived, Rico was sitting on the front porch. (Doc. 101-3, Pg. 8:16-21, 10:5-7). Rico was handcuffed and placed in a cruiser before Rech arrived. (Doc. 101-4, Pg. 7:23 - 8:11). Rico was the only suspect, and LaWanda was never a suspect. (Doc. 101-3, Pg. 21:1-3 | Doc. 101-4, Pg. 9:22 - 10:6). No officer had an arrest warrant. (Doc. 101-4, Pg. 11:16-19).

The City's sworn search warrant affidavit states that Ms. Brown "observed the residence until officers arrived" and identifies no one else who entered the Home. (Doc. 98-6, Pg. 2). LaWanda and Rico told officers no one else was inside. (Doc. 101-3, Pg. 18:19 - 19:2, 19:23 - 20:4). Rech admitted he had no

reason to believe anyone else was inside. (Doc. 101-4, Pg. 10:23 - 11:15). The affidavit reports that LaWanda became "uncoop[e]rative" only "when asked if officers could check the residence for a gun." (Doc. 98-6, Pg. 2). LaWanda refused consent and asked to see a warrant. The officers had none. (Doc. 101-3, Pg. 13:10-25, 17:18-23 | Doc. 101-4, Pg. 15:23 - 16:9).

Officers waited fourteen minutes for a sergeant, a period where nothing about officer safety changed. (Doc. 101-5, Pg. 22:9 - 23:24). Rech arrived, did not ask for consent, and told LaWanda officers were going in. (Doc. 101-4, Pg. 15:15-22). Rech testified that he wanted to "rule out this house" so officers could "focus on the hostile crowd" of neighbors, and he "wasn't worried about evidence." (Doc. 101-4, Pg. 13:1-8, 14:2-13). Rech testified that LaWanda was not uncooperative in any way other than not wanting officers in her Home without a warrant, that she was not a threat, and that he ordered her arrest "[f]or not allowing us to perform a protective sweep." (Doc. 101-4, Pg. 13:10-21, 21:13-23).

Lydon, who stood at the door, testified that LaWanda never put her hands on her, did not push her, and "[t]ried to go around" her. (Doc. 101-3, Pg. 33:4 - 34:16). LaWanda testified that she touched no one. (Doc. 101-2, Pg. 55:1-14, 57:11-21). Even after she was handcuffed, LaWanda did not strike, bite, scratch, kick anyone, or try to get away. (Doc. 101-3, Pg. 42:3-13). Lydon and Schlotzhauer handcuffed LaWanda while she stood on her porch. (Doc. 101-3, Pg.

37:21 - 38:8 | Doc. 101-4, Pg. 18:23-24). Rech then "stepped in," "did an underhook," and "forced . . . her left arm behind her back." (Doc. 101-4, Pg. 19:2-10). Lydon and Schlotzhauer carried LaWanda down the grass toward the cruiser. (Doc. 101-3, Pg. 43:5-13 | Doc. 101-5, Pg. 34:25 - 35:1). Bonam joined and three officers carried LaWanda across her lawn to the cruiser. (Doc. 98-4, Pg. 46:1-10, 50:11-21 | Doc. 101-2, Pg. 70:1-3, 71:1-8 | Doc. 101-3, Pg. 43:14-17 | Doc. 101-5, Pg. 36:10-14).

Bonam held LaWanda in the back of a locked cruiser in a church parking lot, handcuffed, for thirty to forty minutes or longer. (Doc. 98-4, Pg. 55:13-24, 57:11-20). He was waiting to learn from Rech "what her charge would be and if I was booking." (Doc. 98-4, Pg. 71:11 - 72:7). Bonam later told internal affairs that he did "not really" have probable cause to detain LaWanda. (Doc. 98-4, Pg. 58:15-24). Upon Rech's order, Bonam booked LaWanda for obstructing. (Doc. 98-4, Pg. 72:8-24). LaWanda was jailed for roughly six hours and borrowed $500 to post bond. (Doc. 101-2, Pg. 74:7-19, 75:2-6). All charges against LaWanda were dismissed. (Doc. 98-5, Pg. 104:3-6).

With LaWanda in handcuffs, Rech, Lydon, and Schlotzhauer entered the Home without a warrant and searched every room and closet. They found no one. (Doc. 101-3, Pg. 36:15 - 37:13 | Doc. 101-4, Pg. 22:15-17, 25:4-19). Rech brought LaWanda's husband, who had told officers he owned a gun, through the Home

during the sweep without frisking him. (Doc. 101-4, Pg. 26:1-3, 29:11-14). Rech went back inside a second time without a warrant. (Doc. 101-4, Pg. 28:16-19). The search warrant arrived about two hours later. (Doc. 101-4, Pg. 45:8-11).

## ARGUMENT

### I. THE WARRANTLESS ENTRY VIOLATED CLEARLY ESTABLISHED LAW (COUNT III).

"[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6, 133 S. Ct. 1409, 1414, 185 L. Ed. 2d 495 (2013). "Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590, 100 S. Ct. 1371, 1382, 63 L. Ed. 2d 639 (1980). The police "bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin*, 466 U.S. 740, 749-50, 104 S. Ct. 2091, 2097, 80 L. Ed. 2d 732 (1984). It is undisputed that the OPD Officers had neither a warrant nor consent. (Doc. 101-4, Pg. 25:13-19).

The City Defendants emphatically claimed entitlement to conduct a protective sweep at the time, including as shown by the videos. The City Defendants' attorneys now contend, after the fact, that the OPD Officers entered because of exigent circumstances, which is not supported by the evidence, the OPD Officers' testimony, or any video. Regardless, neither exception to the warrant requirement applies.

### A. No OPD Policy Authorized the "Protective Sweep."

OPD's written policy provides: "It is the policy of the Omaha Police Department (OPD) that officers shall not make a warrantless and nonconsensual entry into a private residence or other private property in order to conduct [a] search or make an arrest unless an exception to the warrant requirement exists. Officers will obtain a search warrant whenever time and circumstances permit." (Doc. 92-2, Pg. 32). The OPD's policy places the burden on the officers: "Absent a warrant or an exception as described in this policy, the burden is on the officers conducting a search to prove the search was reasonable." (Doc. 92-2, Pg. 32). The OPD's written policies list the recognized exceptions, and a protective sweep is not among them. (Doc. 98-5, Pg. 76:15 - 77:6). To fill this gaping hole, the City Defendants' attorneys now try to claim exigent circumstances. Knapp, a seventeen-year veteran, reviewed OPD's policies and found nothing that "spells out a protective or safety sweep." (Doc. 98-5, Pg. 71:11 - 72:1, 75:12-21).

OPD's search warrant policy does authorize officers to "[c]onduct a preliminary search for any persons who may be hiding," but only "[w]hen the search site premises are secured" during execution of a search warrant. (Doc. 92-4, Pg. 18, ¶ K.1). Rech agreed that provision applies "after a search warrant is obtained." (Doc. 101-4, Pg. 36:20 - 37:16). OPD policy also requires officers who wish to search a third party's residence for a suspect to "either obtain permission to

search or a search warrant," and requires a Chief's Report whenever officers search private property "without a warrant and without consent." (Doc. 101-1, Pg. 31 | Doc. 101-4, Pg. 41:7 - 42:16). No Chief's Report was prepared. (Doc. 101-4, Pg. 42:2-10).

Rech could not identify any policy that authorized his order to enter LaWanda's home after she told him he could not. Asked where OPD's protective sweep policy could be found, he answered, "I don't recall off the top of my head," and he was not aware of any other term under which such a policy might appear. (Doc. 101-4, Pg. 39:18 - 41:1). Rech had no training on protective sweeps. (Doc. 101-4, Pg. 33:14-21). The OPD Officers did not simply misapply an OPD procedure. They acted outside every OPD procedure that governs entry into a home.

### B. No Law Authorized a Sweep of a Home the Officers Had No Right to Enter.

A protective sweep is "a quick and limited search of premises, incident to an arrest." *Buie*, 494 U.S. at 327, 110 S. Ct. at 1094. The officers in *Buie* held an arrest warrant and probable cause to believe Buie was home, so they "were entitled to enter and to search anywhere in the house in which Buie might be found." *Id.* 494 U.S. at 333, 110 S. Ct. at 1097. The Court expressly limited its holding to a sweep "in conjunction with an in-home arrest." *Id.* 494 U.S. at 337, 110 S. Ct. at

1099. The doctrine is restricted to situations where officers are already lawfully inside.

The OPD Officers had no arrest warrant. They had no search warrant. They were never lawfully inside the Home. There was no in-home arrest. Rico was arrested outside and was already in a cruiser. (Doc. 101-4, Pg. 7:23 - 8:11). "Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest." *Preston v. United States*, 376 U.S. 364, 367, 84 S. Ct. 881, 883, 11 L. Ed. 2d 777 (1964). The "reasons that have been thought sufficient to justify warrantless searches carried out in connection with an arrest no longer obtain when the accused is safely in custody at the station house." *Chambers v. Maroney*, 399 U.S. 42, 47, 90 S. Ct. 1975, 1979, 26 L. Ed. 2d 419 (1970).

"[I]f a search of a house is to be upheld as incident to an arrest, that arrest must take place inside the house." *Vale v. Louisiana*, 399 U.S. 30, 33, 90 S. Ct. 1969, 1971, 26 L. Ed. 2d 409 (1970) (quotation omitted); *United States v. DeBuse*, 289 F.3d 1072, 1074 (8th Cir. 2002) ("Ordinarily, the arrest of a person outside of a residence does not justify a warrantless search of the residence itself."). Nebraska courts applied this rule to Omaha officers decades ago. In *Farber*, Omaha officers arrested two suspects who walked out of a trailer and then went inside to conduct a "protective sweep." 1 Neb. App. at 462, 498 N.W.2d at 800.

The Court held that a sweep is justified only when "the officer's original entry into the home was lawful," and that *Buie* did not apply because "the police in our case were never lawfully within the home." *Id.* 1 Neb. App. at 464, 466, 498 N.W.2d at 801-02. The Nebraska Supreme Court rejected an analogous "security check" justification where the arrestee "was found near the door . . . and was immediately secured," because "[a]t that time the reason for the officers' presence ceased." *State v. Monzu*, 227 Neb. 902, 904, 420 N.W.2d 726, 727-28 (1988).

The City Defendants' cases confirm the limitation that a protective sweep can only be conducted when officers are already present in the home. Each involved officers lawfully executing a warrant. *United States v. Alatorre*, 863 F.3d 810, 812 (8th Cir. 2017) (arrest warrant executed at suspect's residence); *United States v. Boyd*, 180 F.3d 967, 975 (8th Cir. 1999) (parole violator warrant; arrest inside the home); *United States v. Davis*, 471 F.3d 938, 941-45 (8th Cir. 2006) (arrest warrant; prior intelligence of others on the property). The Eighth Circuit respectively reaffirmed that the protective sweep needed to be "incident to arrest" (*Alatorre*, 863 F.3d at 813), "in connection with an in-home arrest" (*Boyd*, 180 F.3d at 975), and "in connection with their execution of the arrest warrant." *Davis*, 471 F.3d at 944.

None of the authority relied upon by the City Defendants authorizes officers without any warrant to enter a home to sweep it while a warrant is being drafted.

Rech's own description of the entry, a sweep "in lieu of a court-authorized warrant," is an end run around the Fourth Amendment and describes exactly what the Fourth Amendment forbids. (Doc. 101-4, Pg. 42:11-16).

### C. Even a Lawful Sweep Would Have Required Articulable Facts About a Dangerous Person, Which Unquestionably Did Not Exist.

Even where officers are lawfully inside, *Buie* requires "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger." 494 U.S. at 334, 110 S. Ct. at 1098; *United States v. Green*, 9 F.4th 682, 691-92 (8th Cir. 2021). The City Defendants identify none. They argue that officers "had no way of knowing or confirming if anyone else was inside." (Doc. 97, Pg. 7). That is the absence of articulable facts and an admission fatal to their defenses.

"Lack of information cannot provide an articulable basis upon which to justify a protective sweep." *United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996). The officer's concern for his safety "must be based on specific and articulable facts." *United States v. Custer*, 281 F. Supp. 2d 1003, 1006 (D. Neb. 2003). "Something more than a speculative hunch is required for police to conduct a protective sweep." *United States v. Anderson*, 688 F.3d 339, 346 (8th Cir. 2012).

Rech admitted he had no reason to believe anyone was inside. (Doc. 101-4, Pg. 10:23 - 11:15). Rech testified, "We weren't looking for a suspect." (Doc. 101-

4, Pg. 41:13-18). Talbitzer stated only that "anyone could be inside of any home at any point." (Doc. 101-6, Pg. 40:15-22). The Eighth Circuit specifically held that the "presence of a domestic violence suspect" inside the home "does not itself justify a protective sweep." *Smith v. Kansas City, Mo. Police Dep't*, 586 F.3d 576, 580-81 (8th Cir. 2009). The Court found that the officer had "no facts indicating that the suspect was a threat to the child or others." *Smith*, 586 F.3d at 580.

Here the suspect was not inside because he had already been arrested and detained by the OPD Officers. The OPD Officers' conduct confirms that no one feared a hidden occupant. They waited fourteen minutes before entering. (Doc. 101-5, Pg. 22:9 - 23:24).

Rech then brought LaWanda's husband, Mr. Williams, into the Home during the "sweep," although Mr. Williams had told officers he owned a gun and no one frisked him. (Doc. 101-3, Pg. 53:5-11 | Doc. 101-4, Pg. 26:1-3, 29:11-14). No OPD policy addresses bringing a civilian into a protective sweep, and Lydon testified that doing so is not standard procedure. (Doc. 101-3, Pg. 49:23 - 50:1 | Doc. 101-4, Pg. 26:8-12). Neither Rech nor Lydon had ever seen it done. (Doc. 101-3, Pg. 50:5-9 | Doc. 101-4, Pg. 26:13-15).

Talbitzer explained that no one else is allowed in during a sweep because anyone entering "could potentially pose a threat to those officers." (Doc. 101-6, Pg. 48:4-12). Knapp likewise testified that officers remove civilians from the area

of a sweep, including because "having somebody in that area opens them up to a potential nonsafe situation." (Doc. 98-5, Pg. 93:12-24). Rech would have placed Mr. Williams in direct danger if indeed there was a legitimate threat in the Home.

Rech wanted Mr. Williams "into my corner" to calm the crowd, and reasoned that anyone hiding inside would hear Mr. Williams and stay peaceful, which is an admission that he did not fear a dangerous person inside. (Doc. 101-4, Pg. 26:16 - 27:19). Yet once the sweep was over, Rech kept Mr. Williams out of the Home because of "allegations of a firearm being in the residence." (Doc. 101-4, Pg. 29:4-10). Tiderington explains that bringing an unsearched civilian into a home believed to hold an armed threat would be "tactically indefensible," and that doing so indicates "the officers themselves did not treat the residence as presenting the kind of danger they later described." (Doc. 101-1, Pg. 27).

**D. Looking for Weapons or Evidence Is Not a Justifiable Basis for a Warrantless Search.**

Unable to identify a dangerous person, the City Defendants retroactively fall back on trying to use a search for property to justify their actions after the fact. This argument fails for two reasons. First, property cannot justify a protective sweep. A sweep is a search "for persons, not things." *Monzu*, 227 Neb. at 903, 420 N.W.2d at 727 (quotation omitted). "*Buie* does not allow a protective sweep for weapons or contraband." *United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005). A belief that a firearm "may have been within the residence, standing

alone, is clearly insufficient." *United States v. Marts*, 986 F.2d 1216, 1218 (8th Cir. 1993).

Second, the protective sweep was not done to search for weapons. According to Rech, a protective sweep can never be about people. (Doc. 101-4, Pg. 37:19-20). Rech testified, "[T]his was just to find people in the residence. I wasn't worried about evidence." (Doc. 101-4, Pg. 14:2-7). Lydon testified, "We were not looking for the gun. We were looking for bodies." (Doc. 101-3, Pg. 37:14-16). Whatever the City Defendants now say they were looking for, the warrant that arrived about two hours later was the only lawful way to look for it.

The search warrant authorized a search of the Home for the victim's cell phone and for "[f]irearms and ammunition." (Doc. 98-7, Pg. 1). OPD's policy permits officers with a warrant to "[c]onduct a preliminary search for any persons who may be hiding." (Doc. 92-4, Pg. 18, ¶ K.1). Rech explained that "when we execute a warrant, we go inside to ensure that there is nobody inside when we're executing a search warrant." (Doc. 101-4, Pg. 37:14-16). Schlotzhauer agreed that the provision applies "once the actual search warrant is issued." (Doc. 101-5, Pg. 46:8-13). Knapp testified that officers look for "things of evidentiary value," including "the gun," once they have "got a search warrant approved through the courts." (Doc. 98-5, Pg. 69:5-12).

The OPD Officers had a recognized and legal mechanism to conduct a search for both people and property that was not incident to an arrest: a warrant. They just needed to wait for it to be issued by a court upon a showing of probable cause. Those are the Constitutional safeguards that the City implements through its written procedures. "Inconvenience of the officers and delay in preparing papers and getting before a magistrate are no justification for by-passing the constitutional requirement" of a warrant. *McDonald v. United States*, 335 U.S. 451, 455, 69 S. Ct. 191, 193, 93 L. Ed. 153 (1948). Because the OPD Officers failed to wait for a warrant, they conducted an unlawful entry and search.

**E. No Exigent Circumstance Existed.**

No suspect was fleeing. Rico was in a cruiser. (Doc. 101-4, Pg. 7:23 - 8:11). No one reported that anyone inside was hurt. (Doc. 101-3, Pg. 9:9-12, 19:14-22). Rech "wasn't worried about evidence." (Doc. 101-4, Pg. 14:2-7). An arrest outside cannot "provide its own 'exigent circumstance' so as to justify a warrantless search of the arrestee's house." *Vale*, 399 U.S. at 35, 90 S. Ct. at 1972. Bonam, a City Defendant, testified that officers lacked authority to enter because "the house wasn't that type of a situation where they had to immediately go in." (Doc. 98-4, Pg. 63:9-21).

OPD's own procedures confirm that no exigency existed. When officers believe evidence may be destroyed or that knocking and announcing "would

significantly compromise the safety of those involved," OPD's procedure is a no-knock warrant from a court, preceded by a sergeant's threat assessment and approved by a captain or deputy chief. (Doc. 92-4, Pg. 15 | Doc. 98-5, Pg. 58:9-25). The sworn warrant application marked the no-knock request "N/A," a section that applies when officers "can show that items sought can be easily or quickly disposed of or destroyed or if life or limb of officer is in danger." (Doc. 98-6, Pg. 2).

Knapp and his sergeant decided a no-knock warrant was unnecessary. (Doc. 98-5, Pg. 47:13 - 48:3, 59:1-12). Rech never sought one because "[i]t's going to take hours to get a no-knock search warrant." (Doc. 101-4, Pg. 35:6-19, 36:14-19). The time it takes to obtain a warrant is not an exigency. *McDonald*, 335 U.S. at 455, 69 S. Ct. at 193. The City Defendants cannot tell a judge under oath that there were no exigent safety or evidence concerns while relying on those same concerns to justify entering the Home with no warrant at all. As Tiderington explains, the decision not to seek a no-knock warrant "strongly suggests that [the officers] themselves did not believe the circumstances presented an imminent threat to officer safety or an immediate risk that evidence would be destroyed." (Doc. 101-1, Pg. 30).

In *Cotten v. Miller*, on which the City Defendants rely, the suspect and potential victims were still inside the apartment where the abuse had just occurred.

74 F.4th 932, 934-37 (8th Cir. 2023). The downstairs neighbor told the officers that she heard "really, really aggressive screaming, screeching, and thuds coming from the upstairs apartment" and "that the screaming and screeching sounded like it came from a woman or child." *Id.* at 934. Here, there was no such complaint and no report of someone being hurt or in danger. The victim was not in the Home, the suspect was in custody, and the only people associated with the Home said no one was inside.

Officers concerned about evidence had a lawful option. They could secure the Home from the outside while they obtained a warrant. *Illinois v. McArthur*, 531 U.S. 326, 331-32, 121 S. Ct. 946, 950, 148 L. Ed. 2d 838 (2001). Knapp testified that is OPD's practice: while a warrant is pending, "nothing changes," and officers secure the residence "waiting for us to get it fully signed and approved before we can act on it." (Doc. 98-5, Pg. 39:11-17). The police in *McArthur* "neither searched the trailer nor arrested McArthur before obtaining a warrant." 531 U.S. at 332, 121 S. Ct. at 950. The OPD Officers did both.

**F. The Law Was Clearly Established.**

By 2009, "a reasonable officer understood that it was unlawful to enter a home without a warrant, absent consent or exigent circumstances." *Smith*, 586 F.3d at 581. *Buie* has limited sweeps to lawful in-home arrests since 1990. *Waldner* held in 2005 that a sweep may not be used to look for weapons. *Monzu*

and *Farber* told Omaha officers in 1988 and 1993 that officers who were "never lawfully within the home" cannot conduct a sweep. Officers need no case with "fundamentally similar" facts when existing law gives fair warning. *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516, 153 L. Ed. 2d 666 (2002). OPD's own policy gave that warning in writing.

Courts have denied qualified immunity to officers with far more justification than the OPD Officers had here. In *Luer v. Clinton*, officers searching for a man who had skipped a cab fare found a door ajar at 3:00 a.m. and searched the entire home. 987 F.3d 1160 (8th Cir. 2021). The Eighth Circuit denied qualified immunity, holding that "something more than a speculative hunch is needed for police to conduct a protective sweep," that the officers did not "have information suggesting that anyone in the home was in need of emergency assistance," and considering "the Supreme Court's frequent cautions that exigent circumstances rarely justify a warrantless home intrusion…" "that the officers' full blown search of the entire Luer-Steinebach domicile without a warrant was objectively unreasonable." *Id.* at 1169-70.

In *Bonivert v. City of Clarkston*, officers responding to a "physical domestic" call forced their way into the home of a man who had refused them entry, although the alleged victim was already outside. *Bonivert v. City of Clarkston*, 883 F.3d 865, 869 (9th Cir. 2018). The Court denied qualified

immunity on the entry and the force that followed, reasoning: "a reasonable officer would have understood that no means no," and no emergency existed because the alleged victim of the domestic assault and her baby were "safely outside the house when the police entered." *Id*. at 875.

In *Mendez v. County of Los Angeles*, deputies who entered without a warrant, consent, or exigency "could not benefit from qualified immunity, because at the time of the incident, case law had clearly established that the officers' entry was unlawful." 897 F.3d 1067, 1073 (9th Cir. 2018).

Rech authorized the entry and went inside, and Lydon and Schlotzhauer went in with him even though they all heard LaWanda refuse consent to do so. (Doc. 101-3, Pg. 47:1-4 | Doc. 101-4, Pg. 25:4-19 | Doc. 101-5, Pg. 41:6-8). They should have known that the OPD policies and the law prohibited them from doing so without the warrant that was in process and that no exigent circumstances existed that would bypass that Constitutional protection. They are not entitled to qualified immunity on Count III.

## II. EVERYTHING THAT HAPPENED ON THE PORCH HAPPENED BECAUSE THE OPD OFFICERS WERE TRYING TO ENTER LAWANDA'S HOME UNLAWFULLY.

The City Defendants describe the confrontation at LaWanda's door as if it arose on its own: a "highly volatile" scene, an uncooperative homeowner, a "push," and a struggle. (Doc. 97, Pg. 6-7, 15-16). It did not. LaWanda was not a

suspect and had committed no crime. The only reason the OPD Officers confronted her at all is that they wanted to enter her Home without a warrant, and she would not agree.

Rech, the person who directed the warrantless sweep and LaWanda's arrest, testified that he arrested her because:

> In the end she believed that we couldn't go into her home without a warrant. That was the end of it. And once I couldn't get past that, I said, you're under arrest for obstructing.

(Doc. 101-4, Pg. 18:9-13; *see also* 38:15 - 39:3). Rech confirmed that LaWanda's only lack of cooperation was not letting the OPD Officers in the Home without a warrant:

> A. When I say she's uncooperative, she's preventing us from doing that protective sweep.
> Q. Because she didn't want you to come into the house without a warrant; is that correct?
> A. Yes.
> Q. Was she uncooperative in any other way other than not letting you in the house -- not wanting you to come in the house because you didn't have a warrant?
> A. No. That was her main complaint at that moment.

(Doc. 101-4, Pg. 13:10-21).

The handcuffing, the carry, the detention, and the jailing all followed LaWanda simply exercising her fundamental right to refuse a warrantless search. None of it had to happen. Had the OPD Officers secured the Home from the outside and waited for the warrant, as *McArthur*, OPD policy, and their own

detective contemplated, there would have been no confrontation, no arrest, no force, and no detention. Even if officers could have kept LaWanda from going back inside her Home unaccompanied, that is not why she was arrested. By Rech's own account, she was arrested because she would not let the officers go in. (Doc. 101-4, Pg. 18:9-13, 21:16-23).

Officers may not rely on circumstances they created "by engaging or threatening to engage in conduct that violates the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 462, 131 S. Ct. 1849, 1858, 179 L. Ed. 2d 865 (2011); *see also United States v. Duchi*, 906 F.2d 1278, 1284 (8th Cir. 1990) ("the situations of urgency protected by this exception cannot be created by police officers"). The Supreme Court specifically warned that the exigency rule should not apply "where the police, without a warrant or any legally sound basis for a warrantless entry, threaten that they will enter without permission unless admitted." *King*, 563 U.S. at 462 n.4, 131 S. Ct. at 1858 n.4.

The exact circumstance the Supreme Court warned about happened here. Rech did not ask for consent; he told LaWanda the officers were going in. (Doc. 101-4, Pg. 15:15-22). The only thing that made the porch tense was the OPD Officers' announced intention to search the Home over LaWanda's objection. A homeowner's distress at being told police will search her home without a warrant

is neither a justification for the search nor a crime. This is especially so after the OPD Officers asked for consent and were denied.

Even if the Court found arguable probable cause for the arrest, or found the force reasonable in isolation, neither of which is the case, LaWanda could recover for those harms on her claim for unlawful entry. "Plaintiffs can—subject to qualified immunity—generally recover damages that are proximately caused by any Fourth Amendment violation." *Cnty. of Los Angeles v. Mendez*, 581 U.S. 420, 431, 137 S. Ct. 1539, 1548, 198 L. Ed. 2d 52 (2017) (holding that "if respondents cannot recover on their excessive force claim, that will not foreclose recovery for injuries proximately caused by the warrantless entry."). "[U]nlawful entry invites violence." *Mendez*, 897 F.3d at 1077 (finding that "the injuries would have been equally avoided had the officers not entered unlawfully without warrant or consent or exigent circumstances.").

The causal chain here is obvious and direct. LaWanda's arrest was the means by which the OPD Officers carried out the entry: Rech removed the one person standing between his officers and the door, and they went inside as soon as she was in handcuffs. (Doc. 101-4, Pg. 18:9 - 19:10, 25:4-19). LaWanda's arrest and detention were unlawful because, by the arresting officer's admission, they were done because she refused to consent to a warrantless search of her Home.

## III. THE OPD OFFICERS LACKED EVEN ARGUABLE PROBABLE CAUSE TO ARREST LAWANDA (COUNT I).

A warrantless arrest violates the Fourth Amendment unless supported by probable cause, and arguable probable cause exists only where an officer's mistaken belief is "objectively reasonable." *Nieters*, 83 F.4th at 1105-06 (quotation omitted). Officers may not disregard exculpatory evidence. *Id.* at 1107. The City Defendants argue only that the OPD Officers had arguable probable cause for obstructing a peace officer under Neb. Rev. Stat. § 28-906. (Doc. 97, Pg. 4-8). They make no separate argument on the retaliation component, for which the absence of probable cause is "weighty evidence that the officer's animus caused the arrest." *Nieves v. Bartlett*, 587 U.S. 391, 402, 139 S. Ct. 1715, 1724, 204 L. Ed. 2d 1 (2019).

### A. Insisting on a Warrant Is Not a Crime.

A resident has "a constitutional right to insist that the inspectors obtain a warrant to search" and "may not constitutionally be convicted for refusing to consent." *Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 540, 87 S. Ct. 1727, 1737, 18 L. Ed. 2d 930 (1967). An occupant "need not allow the officers to enter the premises." *King*, 563 U.S. at 470, 131 S. Ct. at 1862. In *District of Columbia v. Little*, the Supreme Court reversed the conviction of a homeowner who refused to unlock her door for an official seeking warrantless entry, holding that "interfere" "cannot fairly be interpreted to encompass

respondent's failure to unlock her door and her remonstrances on constitutional grounds." 339 U.S. 1, 6-7, 70 S. Ct. 468, 471, 94 L. Ed. 599 (1950).

"The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 451, 462-63, 107 S. Ct. 2502, 2510, 96 L. Ed. 2d 398 (1987); *see Thurairajah v. City of Fort Smith*, 925 F.3d 979, 985 (8th Cir. 2019) (affirming denial of qualified immunity from retaliation claim because "[c]riticism of law enforcement officers, even with profanity, is protected speech"); *Murphy v. Schmitt*, 143 F.4th 914, 919-20 (8th Cir. 2025) (officer cannot manufacture probable cause by issuing a demand lacking legal authority and arresting for noncompliance).

That is what happened here. Rech testified that LaWanda was uncooperative only in that she did not want the officers in her Home without a warrant, and that he arrested her because he "couldn't get past" her insistence on a warrant. (Doc. 101-4, Pg. 13:12-21, 18:9-13). Bonam told internal affairs LaWanda was arrested because she "refused to allow officers to go inside her residence." (Doc. 98-4, Pg. 62:1-23). Bonam's booking narrative describes her as "adamant that officer's were not coming inside her residence to look for anything." (Doc. 98-2, Pg. 1). Those are descriptions of a homeowner exercising the right recognized in *Camara*, *King*, and *Little*.

### B. The Officer at the Door Testified That LaWanda Did Not Push or Strike Her, and No Officer Claims LaWanda Threatened Anyone.

Section 28-906(1) reaches only a person who obstructs "by using or threatening to use violence, force, physical interference, or obstacle." A "mere verbal refusal" is not enough. *State v. Ferrin*, 305 Neb. 762, 774, 776-77, 942 N.W.2d 404 (2020); *State v. Yeutter*, 252 Neb. 857, 862, 566 N.W.2d 387, 391 (1997). The Eighth Circuit has held that an arrest "for obstruction due to his continued presence in his doorway was unreasonable." *Hoyland v. McMenomy*, 869 F.3d 644, 652-55 (8th Cir. 2017).

The City Defendants cast LaWanda as a dangerous suspect who "pushed" toward the door and "made contact with" Lydon. (Doc. 96, ¶¶ 19, 26). The evidence tells a different story. The officer who was actually at the door does not support the City's account, and no officer claims LaWanda threatened anyone.

Lydon testified that "physically she didn't strike me," that LaWanda did not "[p]hysically push" her but "[t]ried to go around" her, and that LaWanda never put her hands on her or on any other officer. (Doc. 101-3, Pg. 33:4-16, 34:9-16). Lydon, Rech, Schlotzhauer, and Bonam each testified that LaWanda did not threaten anyone. (Doc. 98-4, Pg. 57:5-10 | Doc. 101-3, Pg. 22:11-16, 34:17-20 | Doc. 101-4, Pg. 19:24 - 20:2, 21:13-15 | Doc. 101-5, Pg. 30:8-12).

Rech admitted that LaWanda's only lack of cooperation was not wanting officers in her Home without a warrant. (Doc. 101-4, Pg. 13:16-21). Even during

the handcuffing and the walk to the cruiser, LaWanda did not pull away, the officers did not have to take LaWanda to the ground, and LaWanda did not strike anyone, "bite, scratch, claw, kick," or try to "spin away, run away, get away." (Doc. 101-3, Pg. 38:9-24, 42:3-13). LaWanda likewise testified that she blocked no one, made no physical contact with any officer, and did nothing but speak with the officers. (Doc. 101-2, Pg. 55:1-5, 57:4-21, 68:15 - 69:8).

On this record, and based upon the Officers' own testimony, there was no probable cause to arrest LaWanda. At a minimum, there is a genuine issue of fact on whether an arrest was warranted that needs to be resolved by the jury.

### C. No Reasonable Officer Could Believe a Homeowner Commits a Crime by Declining to Permit an Unauthorized Entry.

Section 28-906 protects officers acting "under color of [their] official authority." *Ferrin*, 305 Neb. at 773. The task LaWanda supposedly obstructed was an entry that no OPD policy authorized and no law permitted. Lydon, Schlotzhauer, and Knapp each testified that entry required a warrant absent consent or a genuine exigency. (Doc. 98-5, Pg. 42:22 - 43:9 | Doc. 101-3, Pg. 17:14-17 | Doc. 101-5, Pg. 18:4-7). The OPD Officers obviously knew that they needed consent to go in the Home, which is why they asked LaWanda for it.

A reasonable officer under the circumstances could not believe that refusing to yield to the entry was a crime. Tiderington agrees. In his opinion, "insistence on a warrant, or refusal to consent to a search does not, without more, create

probable cause for an obstruction arrest," and "officers are trained to know that a person cannot lawfully be arrested for obstructing an unlawful entry." (Doc. 101-1, Pg. 33).

Rech admitted that LaWanda was not a threat and that he "could" have cited her. (Doc. 101-4, Pg. 21:13-15, 24:1-8). OPD policy directs officers to issue citations in lieu of arrest "to the maximum extent consistent with the effective enforcement of the law and the protection of the public." (Doc. 92-4, Pg. 35, ¶ VIII). Instead of receiving a citation similar to a parking ticket in the mail, LaWanda was handcuffed, carried across her lawn in front of her neighbors, held while the officers decided what to charge her with, and jailed.

A jury could find that the arrest was made to punish LaWanda for insisting on a warrant. The Eighth Circuit has made clear what is required of officers in this situation: "They must avoid arresting persons without at least arguable probable cause. They must not take adverse actions against persons for exercising their First Amendment rights." *Hoyland*, 869 F.3d at 657-58. Rech ordered the arrest, Lydon and Schlotzhauer handcuffed her, and Bonam held and booked her. (Doc. 98-4, Pg. 72:21-24 | Doc. 101-3, Pg. 37:21-25 | Doc. 101-4, Pg. 21:7-23). Those officers are not entitled to qualified immunity on Count I.

## IV. COUNT II FOR FALSE IMPRISONMENT/SEIZURE OF PERSON IS A FOURTH AMENDMENT CLAIM, AND THE STATE TORT CLAIMS ACT DOES NOT APPLY TO IT.

The City Defendants treat Count II as a state law claim barred by Neb. Rev. Stat. § 13-910(7). (Doc. 97, Pg. 8-11). Count II is brought under 42 U.S.C. § 1983 for seizure "in violation of the Fourth, Fifth, and Fourteenth Amendments." (Doc. 84, ¶¶ 1, 26, 62-67). Conduct "wrongful under 42 U.S.C. § 1983 . . . cannot be immunized by state law." *Martinez v. California*, 444 U.S. 277, 284 n.8, 100 S. Ct. 553, 558 n.8, 62 L. Ed. 2d 481 (1980); *Howlett v. Rose*, 496 U.S. 356, 375-76, 110 S. Ct. 2430, 2442-43, 110 L. Ed. 2d 332 (1990). "The Fourth Amendment prohibits government officials from detaining a person in the absence of probable cause." *Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 367, 137 S. Ct. 911, 918, 197 L. Ed. 2d 312 (2017).

The City Defendants' *Gerstein v. Pugh* authorities have no applicability here because they address how long a lawfully arrested person may be held before a probable cause hearing. (Doc. 97, Pg. 10-11). LaWanda does not claim a lawful detention lasted too long. She claims there was never probable cause to seize her and doing so violated her rights arising under the United States Constitution. That confinement included thirty to forty minutes or more in handcuffs in a church parking lot while Bonam waited to learn "what her charge would be," and roughly six hours in jail. (Doc. 98-4, Pg. 55:13-24, 71:11 - 72:7 | Doc. 101-2, Pg. 75:2-6).

LaWanda was detained even though Bonam told internal affairs he did "not really" have probable cause to detain her. (Doc. 98-4, Pg. 58:15-24). Bonam's acknowledgement is not a surprise because LaWanda's only alleged crime was refusing to consent to a warrantless search of her Home and the OPD policies permitted her to be cited in lieu of any detention or arrest.

## V. RECH IS LIABLE FOR MALICIOUS PROSECUTION (COUNT IV).

### A. Count IV Reaches Rech.

The City Defendants argue that Count IV was asserted only against the City Prosecutors, who were dismissed. (Doc. 97, Pg. 19). Count IV alleges that LaWanda was charged "[b]ecause she exercised her right to be free from a warrantless search and seizure," that the charges were "baseless" and retaliatory, that all charges were dismissed, and that "Defendants' malicious prosecution was willful." (Doc. 84, ¶¶ 75-80). It incorporates every preceding allegation, including that the OPD Officers arrested LaWanda and booked her for obstructing. (Doc. 84, ¶ 74). The City Defendants have known since it happened that Rech was the person who decided to press charges against LaWanda and determined the charge.

### B. The Evidence Supports Each Element of Malicious Prosecution Against Rech.

A Fourth Amendment malicious prosecution claim requires "the wrongful initiation of charges without probable cause," leading to a seizure, and a prosecution that "ended without a conviction." *Thompson v. Clark*, 596 U.S. 36,

43, 49, 142 S. Ct. 1332, 1337-38, 1341, 212 L. Ed. 2d 382 (2022). The claim lies against the officer who brings the charge. *Chiaverini v. City of Napoleon, Ohio*, 602 U.S. 556, 556, 144 S. Ct. 1745, 1746, 219 L. Ed. 2d 262 (2024) (to prevail, "he had to show that the officers brought criminal charges against him without probable cause, leading to an unreasonable seizure of his person") (syllabus).

Each element is satisfied on this record. First, Rech initiated the charge. He agreed that he "authorized Ms. Williams to be arrested at the scene for obstruction," and testified: "I said obstructing." (Doc. 101-4, Pg. 23:4-12, 33:7-10). Bonam held LaWanda in the cruiser waiting for Rech's word on "what her charge would be," and booked her for obstructing only after Rech's message. (Doc. 98-4, Pg. 71:22 - 72:24, 73:21-22). Second, the obstructing charge lacked probable cause for the reasons stated previously in this Brief. Rech's charging decision rested on LaWanda's refusal to allow an entry that no policy or law authorized and was done in retaliation for LaWanda refusing to consent to the OPD Officers' request to search her Home. Third, the charge caused LaWanda's seizure: she was booked, held in jail for about six hours, and released only after borrowing $500 to post bond. (Doc. 101-2, Pg. 74:7-19, 75:2-6). Fourth, every charge against her was dismissed. (Doc. 98-4, Pg. 74:1-3 | Doc. 98-5, Pg. 104:3-6).

## VI. GENUINE DISPUTES OF FACT PRECLUDE SUMMARY JUDGMENT ON COUNT V (EXCESSIVE FORCE).

Force is evaluated under "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443 (1989). Force "is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009).

OPD's own "Response to Resistance – Use of Force" policy tracks *Graham*. It directs officers to "use only that amount of force which is objectively reasonable to take a subject into custody," and to weigh "[t]he seriousness of the crime," "[t]he level of threat or resistance presented by the subject," and whether "the subject poses an immediate threat to the safety of the officer(s) or others." (Doc. 92-4, Pg. 19-20, 22). OPD requires its officers to use de-escalation techniques "[w]hen safe under the totality of circumstances, and when time and circumstances permit," and it provides that "[t]he officer's response will use the least amount of force necessary to control the subject." (Doc. 92-4, Pg. 21, 25). OPD's policy states that "[t]he use of excessive or unwarranted physical force is prohibited and will not be tolerated." (Doc. 92-4, Pg. 22).

There was no need for the OPD Officers to use any force, let alone the force they used. LaWanda was a woman standing on her own porch in her slippers. (Doc. 98-2, Pg. 1 | Doc. 101-2, Pg. 70:5-10, 71:15-22). By Lydon's count, five officers were on scene before anyone went into the Home. (Doc. 101-3, Pg. 25:19-23). LaWanda's only offense was a misdemeanor without probable cause that was later dismissed.

LaWanda was admittedly not a threat. (Doc. 101-4, Pg. 21:13-15). LaWanda did not flee or pull away from the OPD Officers when she was being cuffed. (Doc. 101-3, Pg. 38:9-15). Tiderington, who has examined hundreds of use-of-force incidents for compliance with policy and the appropriateness of the force employed, reviewed the body camera footage and the officers' testimony. He found "no reliable evidence that she attempted to flee, threatened officers, assaulted officers, or otherwise engaged in conduct that materially prevented them from carrying out a lawful police function." (Doc. 101-1, Pg. 7, 33). In his opinion, "[a]t most, her actions reflected a homeowner objecting to an unjustified warrantless entry into her residence." (Doc. 101-1, Pg. 33).

LaWanda testified that officers yanked her arms behind her, that she lost her footing on the grass in her slippers, that officers dragged and then carried her to the cruiser, and that she never refused a command to get up. (Doc. 101-2, Pg. 69:19 -

72:7). LaWanda experienced shooting pain down her left side and completed physical therapy. (Doc. 101-2, Pg. 75:13 - 76:17).

The record identifies the officers who used force on LaWanda. Rech directed the officers to handcuff her. (Doc. 101-4, Pg. 21:7-9). Lydon held her right arm and Schlotzhauer her left, and Rech "stepped in," "did an underhook," and "forced . . . her left arm behind her back." (Doc. 101-4, Pg. 18:23 - 19:10). Once LaWanda was on the lawn, Rech directed the officers to pick her up. (Doc. 101-4, Pg. 22:22 - 23:3). Lydon and Schlotzhauer each testified that three officers carried her to the cruiser, and Bonam testified that he was one of them. (Doc. 98-4, Pg. 45:23 - 46:10, 50:11-21 | Doc. 101-3, Pg. 43:9-17 | Doc. 101-5, Pg. 35:21-23, 36:7-14).

LaWanda testified that they "drug" her and "somebody had my feet and somebody had my arms." (Doc. 101-2, Pg. 71:5-8). Schlotzhauer conceded that LaWanda ended up on the ground while the officers were carrying her. (Doc. 101-5, Pg. 36:2-9). Each of these officers is a named defendant, and each is answerable for the force he or she personally used. *Smith*, 586 F.3d at 581 ("An officer may be held liable only for his or her own use of excessive force.").

Measured against OPD's own standards, the force was unwarranted. Under OPD's policy, a person who "fail[s] to complete a physical action upon lawful direction" but "offers no physical resistance" is a "Passively Resistive Subject."

(Doc. 92-4, Pg. 26). Even crediting the OPD Officers' claim that LaWanda went limp on the lawn, which she disputes, that is passive resistance. (Doc. 101-2, Pg. 71:23 - 72:7). OPD's policy also directs officers to consider "the number of potential assailants and officers." (Doc. 92-4, Pg. 22). Here, at least five officers faced one mother in her slippers who, by the supervising sergeant's own admission, was not a threat. A jury could find that no reasonable officer would answer a nonthreatening, at most passively resistant, homeowner with an underhook, a forced arm, and a carry across her lawn.

The Eighth Circuit has denied qualified immunity for more than de minimis force against nonthreatening, nonresisting misdemeanants. *Smith*, 586 F.3d at 581-82 ("a jury could conclude that under the facts asserted, Taff acted unreasonably by forcibly removing Plaintiff from his home and injuring him"); *Shannon v. Koehler*, 616 F.3d 855, 862-65 (8th Cir. 2010) ("assuming he was not threatening anyone, not resisting arrest, and so on—it was not reasonable for Officer Koehler to use more than de minimis force against him"); *Montoya v. City of Flandreau*, 669 F.3d 867, 871-73 (8th Cir. 2012) (jury question existed where "Montoya was not threatening anyone, was not actively resisting arrest, and was not attempting to flee" and at most her actions amounted to misdemeanor disorderly conduct). A jury must decide whether the force deployed against LaWanda was unreasonable.

## VII. THE CITY IS LIABLE UNDER *MONELL*.

The City is a named defendant, and the Second Amended Complaint alleges its policy, custom, and failure to train and supervise, and incorporates those allegations into Counts I through V. (Doc. 84, ¶¶ 6, 46-56, 62, 68, 74, 81); *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11, 135 S. Ct. 346, 347, 190 L. Ed. 2d 309 (2014). The City's no-violation argument fails for the reasons above, and "there is no tradition of immunity for municipal corporations." *Owen v. City of Independence*, 445 U.S. 622, 638, 100 S. Ct. 1398, 1409, 63 L. Ed. 2d 673 (1980).

A municipality is liable for violations caused by a "governmental custom," *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 2035-36, 56 L. Ed. 2d 611 (1978), or by a failure to train amounting to deliberate indifference, *City of Canton v. Harris*, 489 U.S. 378, 388-90, 109 S. Ct. 1197, 1204-06, 103 L. Ed. 2d 412 (1989). The record shows that warrantless pre-warrant "sweeps" are an unwritten OPD practice that operates outside OPD's written policies:

- The Domestic Violence Unit and its sergeant directed the entry "in the process of getting the warrant." (Doc. 101-5, Pg. 16:13-16 | Doc. 101-6, Pg. 32:2-23).
- Lydon testified a sweep "is done typically" when "a search warrant's being written." (Doc. 101-3, Pg. 28:2-9, 28:25 - 29:7).
- Knapp testified officers sweep "before the warrant because otherwise you could be sitting there for hours." (Doc. 98-5, Pg. 61:19-23).

- Rech told LaWanda's family on body camera that OPD had done this "a hundred times." (Doc. 98, Exhibit 12 Officer Rech's Body Cam footage 0:10:06 | Doc. 101-1, Pg. 34).

- No written policy authorizes the practice, OPD does not train on it, and Rech and Knapp could not identify any training. (Doc. 98-5, Pg. 71:11 - 72:1, 73:12-15 | Doc. 101-4, Pg. 33:14-21, 39:18 - 41:1).

- The mandatory Chief's Report that would have exposed the entry to review was not prepared. (Doc. 101-1, Pg. 31 | Doc. 101-4, Pg. 41:23 - 42:16).

- OPD internal affairs, reporting to the Chief of Police, exonerated the officers on the stated basis that the sweep was "for officer safety and the preservation of evidence," a rationale *Waldner* and *Monzu* reject. (Doc. 101-6, Pg. 51:6 - 54:7).

Tiderington also concluded that the City "failed to properly train and supervise its officers with respect to fundamental police practices principles governing warrantless entries, protective sweeps, and the reporting and accountability requirements associated with such actions." (Doc. 101-1, Pg. 33). In his opinion, the record reflects "not an isolated misunderstanding, but rather a belief that such conduct is routine and permissible" and "a failure at the departmental level to properly train officers on the limits of their authority." (Doc. 101-1, Pg. 34).

A jury could find that the City knew of the unlawful practice through its supervisors, never trained on the actual limits of the protective sweep doctrine, and approved this entry and its basis after the fact. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S. Ct. 915, 926, 99 L. Ed. 2d 107 (1988). Because the

arrest was made to accomplish the entry, the custom was also a moving force behind the arrest and detention.

## CONCLUSION

No OPD policy authorized the OPD Officers to enter LaWanda's Home, and no law permitted it. They had no arrest warrant, no search warrant, no consent, and no emergency, and they were never lawfully inside. When LaWanda insisted on a warrant, Rech had her arrested and charged. LaWanda respectfully requests that the Court deny the City Defendants' Motion for Summary Judgment as to Counts I, II, III, IV, and V and as to the City's Monell liability.

LaWanda Valentine-Williams, Plaintiff,

By: *<u>/s/ Jason M. Bruno</u>*

Jason M. Bruno, NE #23062
Diana J. Vogt, NE #19387
SHERRETS BRUNO & VOGT LLC
260 Regency Parkway Drive, St. 200
Omaha, NE 68114
(402)390-1112 Telephone
(402)390-1163 Facsimile
law@sherrets.com
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF COMPLIANCE

Pursuant to NECivR 7.1(d)(1)(A), I hereby certify that this Brief complies with the applicable word count limitation. Specifically, this brief contains 9,599 words, using proportional spacing and a 14-point type (Times New Roman for Microsoft Word). The brief has been prepared using the word-processing software with Microsoft Office 2016 and Adobe Acrobat DC, and the word count was applied to include all text, including the caption, headings, footnotes, and quotations.

I certify that no generative artificial intelligence program was used in drafting the document, or that to the extent such a program was used, a human signatory of the document verified the accuracy of all generated text, including all citations and legal authority.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court for the United States District Court for the District of Nebraska using the CM/ECF system on this 26th day of November 2026, which system sent notification to counsel of record.

*/s/ Jason M. Bruno*