**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| LAWANDA J. VALENTINE-WILLIAMS,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF OMAHA, NEBRASKA, MATTHEW A. RECH, DARRELLE F. BONAM, ANGELA M. LYDON, MOLLY TALBITZER, HEIDI SCHLOTZHAUER, JUSTIN KNAPP, KEVIN SLIMP, MAKAYLA DANNER, and JANE and JOHN DOES 1-10,<br><br>Defendants. | **Case No. 8:24-cv-165**<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS** |

Pursuant to NECivR 56.1(b), Plaintiff LaWanda J. Valentine-Williams ("LaWanda") submits her Response to the Separate Statement of Material Facts filed by Defendants Matthew A. Rech ("Rech"), Darrelle F. Bonam ("Bonam"), Angela M. Lydon ("Lydon"), Molly Talbitzer ("Talbitzer"), Heidi Schlotzhauer ("Schlotzhauer"), Justin Knapp ("Knapp") (collectively, "the OPD Officers"), and the City of Omaha ("the City") (together, "the City Defendants"), and her Statement of Additional Material Facts.

## RESPONSE TO THE CITY DEFENDANTS' STATEMENT OF MATERIAL FACTS

1. On the morning of May 12, 2021, Marilyn Brown and Rico Valentine got into a domestic dispute at 3925 Vernon Avenue, Omaha, NE 68111.

   **RESPONSE:** Undisputed.

2. According to Ms. Brown, Mr. Valentine broke into her home by climbing through a window, damaged a screen cover, and began arguing with her when she arrived at the house.

   **RESPONSE:** Undisputed that Ms. Brown made these statements to officers.

3. During the dispute, Ms. Brown sustained injury when Mr. Valentine backhanded her, knocked the cap off her front tooth, slammed her head into the wall ten times, and broke her nails.

   **RESPONSE:** Undisputed that Ms. Brown reported these events to officers.

4. Ms. Brown called the police to report the argument. While making the call, Mr. Valentine stole her phone, talked to the police himself, and fled the scene with the now-stolen phone.

   **RESPONSE:** Undisputed that Ms. Brown reported these events to officers.

5. Officer Talbitzer and Officer Schlotzhauer were the responding officers to Ms. Brown's first incident that morning.

   **RESPONSE:** Undisputed.

6. Later that morning, Officer Schlotzhauer and Officer Talbitzer responded to a call at a home located at 3726 N. 40th Street, Omaha, Nebraska 68111. The officers were called because this was a continuation of the earlier incident between Ms. Brown and Mr. Valentine.

   **RESPONSE:** Undisputed.

7. Before officers arrived on the scene of the second call, Ms. Brown had GPS-tracked her stolen phone to the home of Mr. Valentine's mother, Plaintiff LaWanda Valentine-Williams, and stepfather, Gene Williams.

**RESPONSE:** Undisputed that Ms. Brown reported that she had GPS-tracked her phone to LaWanda's home at 3726 North 40th Street ("the Home").

8. Mr. Valentine told officers that before they arrived, he had gone to the home after his argument with Ms. Brown to use his mother's car.

**RESPONSE:** Undisputed that Rico Valentine ("Rico") made this statement to officers.

9. Sometime before officers arrived, Mr. Valentine hid the stolen phone inside Plaintiff's home.

**RESPONSE:** Objection. Foundation. Hearsay. Speculation. The record citation does not support the alleged statement of fact.

10. According to Mr. Valentine, before officers arrived and upon seeing Ms. Brown and a friend, Kacey Waytes, drive down the street towards him, Mr. Valentine entered his mother's car, drove down the street, and pulled into a neighbor's driveway.

**RESPONSE:** Undisputed that Rico made this statement to officers.

11. According to Ms. Brown, Mr. Valentine brandished a handgun at them before running back into his mother's home.

**RESPONSE:** Undisputed that Ms. Brown made this report to officers.

12. Officer Lydon and Officer Acquazzino were the responding officers to the second call. Officer Lydon and Officer Acquazzino approached the home and spoke to Mr. Valentine, who was sitting on the porch.

**RESPONSE:** Undisputed.

13. Officer Schlotzhauer and Officer Talbitzer arrived on the scene to assist Officer Lydon and Officer Acquazzino because they were the responding officers earlier that morning, and knew the context of the dispute.

**RESPONSE:** Undisputed.

14. Plaintiff exited the house and stepped onto the front porch while the officers were speaking with Mr. Valentine.

**RESPONSE:** Disputed in part. The officers were not speaking with Rico at the time LaWanda exited her Home. (Doc. 98, Exhibit 6 Officer Acquazzino's Body Cam footage 02:26).

15. Officer Lydon asked Plaintiff if police could search the house for the phone reported stolen by Ms. Brown. Plaintiff refused.

**RESPONSE:** Undisputed.

16. Officer Lydon stood on the porch to not let anyone in or out of the house to secure the premises, because a search warrant was being written.

**RESPONSE:** Undisputed.

17. Mr. Valentine was detained because a search warrant was being written "for our safety and yours", according to Officer Acquazzino.

**RESPONSE:** Undisputed in part. Rico was detained. The officers said they were obtaining a search warrant. The officers told Rico they were

detaining him "for our safety and yours." (Doc. 98, Exhibit 6 Officer Acquazzino's Body Cam footage 21:22-22:18).

18. Officer Lydon informed Plaintiff, "They are going to write a search warrant on the house so we can't let anybody else inside."

**RESPONSE:** Undisputed.

19. Plaintiff attempted to push past Officer Lydon and enter the home by herself, and contacted Officer Lydon's arm and body.

**RESPONSE:** Objection. Argumentative. Foundation. Compound. Not Concise. Self-serving. The record citations do not support the alleged statement of fact. Without waiving her objection, LaWanda disputes this paragraph. LaWanda tried to walk into her own Home, and Lydon blocked and initiated contact with LaWanda. LaWanda did not push Lydon. (Doc. 98, Exhibit 6 Officer Acquazzino's Body Cam footage 22:12-22:25 | Doc. 98, Exhibit 5 Officer Lydon's Body Cam footage 20:42-20:59 | Doc. 101-3, Pg. 33:4 - 34:16).

20. Officer Lydon informed Plaintiff, "They are writing a search warrant on the house. I asked for permission to search and you said no. Okay? That's why they're writing a warrant on it. No one can go inside."

**RESPONSE:** Undisputed.

21. Officer Talbitzer asked Plaintiff "Is there anyone else in the house?" to which Plaintiff responded, "No, there isn't anybody else in there."

**RESPONSE:** Undisputed.

22. Officer Talbitzer stated to Plaintiff they needed to conduct a protective sweep. Plaintiff refused to allow entry by stating "No, uh-uh, I ain't gotta talk to y'all. Fuck that."

**RESPONSE:** Undisputed. That is one of the many verbal ways LaWanda refused the demands to conduct a warrantless search of her Home.

23. Officer Talbitzer asked Plaintiff for her identification and Plaintiff refused to provide identification.

**RESPONSE:** Undisputed. Talbitzer also inaccurately told LaWanda that she was required to give her name and date of birth.

24. Officer Schlotzhauer told Plaintiff, "Ma'am, we have to do a protective sweep of your house right now." Plaintiff ignored officers' statement.

**RESPONSE:** Undisputed that Schlotzhauer made the quoted statement. LaWanda had already refused consent to any entry. (Doc. 96, ¶¶ 15, 22).

25. Sergeant Rech approached the door and Officer Schlotzhauer informed Plaintiff, "We are going to enter your house."

**RESPONSE:** Undisputed.

26. Plaintiff pushed towards the door to the house and again made contact with the front of Officer Lydon's body.

**RESPONSE:** Objection. Argumentative. Foundation. Self-serving. The record citation does not support the alleged statement of fact. Without waiving her objection, LaWanda disputes this paragraph. Two officers grabbed and initiated contact with LaWanda. (Doc. 98, Exhibit 12 Officer Rech's Body Cam footage 00:45-01:03). Lydon testified that LaWanda

never put her hands on her and did not push her. (Doc. 101-3, Pg. 33:4 - 34:16).

27. Sergeant Rech told Plaintiff, "We have to go in and do a precursor sweep just so we know nobody's in there." Plaintiff responded, "No you're not doing shit. You're not doing nothing."

**RESPONSE:** Undisputed.

28. Plaintiff shouted "Show it to me!" multiple times, in reference to the warrant being written.

**RESPONSE:** Undisputed that LaWanda asked to see the warrant. No warrant had been issued, and the officers had none. (Doc. 101-3, Pg. 17:18-23 | Doc. 101-4, Pg. 15:23 - 16:9, 25:7-15).

29. Plaintiff refused to move from the porch, yelled at officers, and refused to listen to Sergeant Rech's instructions to allow officers to perform a protective sweep.

**RESPONSE:** Objection. Argumentative. Foundation. Compound. Not Concise. Vague. Self-serving. The record citation does not support the alleged statement of fact. Without waiving her objection, LaWanda disputes this paragraph. LaWanda stated, you aren't going in my house without a search warrant. LaWanda was never asked to leave the porch. LaWanda admits that she would not consent to the OPD Officers entering her Home without a search warrant. Rech shouted at LaWanda, told her that officers were going into her Home without the warrant that was then being written,

and caused the escalation that followed. (Doc. 98, Exhibit 12 Officer Rech's Body Cam footage 01:30-02:00).

30. Plaintiff began resisting Officer Lydon and Schlotzhauer's attempts to restrain her.

**RESPONSE:** Objection. Vague. Without waiving her objection, LaWanda disputes this paragraph. LaWanda did not pull away from the OPD Officers when she was being handcuffed. (Doc. 101-3, Pg. 38:9-15). Lydon and Schlotzhauer held LaWanda's arms, and Rech used an underhook to force her left arm behind her back. (Doc. 101-4, Pg. 18:23 - 19:10).

31. Officer Lydon instructed Plaintiff to place her hands behind her back, to which she responded "No, God damnit!"

**RESPONSE:** Disputed in part. Two officers were physically grabbing LaWanda because she refused to consent to a warrantless entry. (Doc. 98, Exhibit 12 Officer Rech's Body Cam footage 02:03-02:06).

32. Plaintiff was escorted off the porch and became dead weight in the front lawn of the home.

**RESPONSE:** Disputed. LaWanda lost her footing on the grass in her slippers, and the OPD Officers dragged and then carried her to the cruiser. LaWanda never refused a command to get up. (Doc. 101-2, Pg. 69:19 - 72:7). Lydon, Schlotzhauer, and Bonam carried LaWanda across her lawn. (Doc. 98-4, Pg. 45:23 - 46:10 | Doc. 101-3, Pg. 43:9-17).

33. Officers attempted to stand Plaintiff back up, but Plaintiff was uncooperative and passively resisted officer instruction.

**RESPONSE:** Objection. Argumentative. Foundation. Self-serving. Vague. Compound. Not Concise. The record citation does not support the alleged statement of fact. Without waiving her objection, LaWanda disputes this paragraph. LaWanda was screaming in pain and told the OPD Officers that they were hurting her. (Doc. 98, Exhibit 5 Officer Lydon's Body Cam footage 38:55-40:22). LaWanda never refused a command to get up. (Doc. 101-2, Pg. 71:23 - 72:7).

34. Plaintiff's husband, Mr. Gene Williams, arrived at the home.

**RESPONSE:** Undisputed.

35. Plaintiff was escorted to a marked police cruiser, and Officer Bonam drove Plaintiff away from the scene for her safety and the safety of others because a crowd had developed in the adjacent property and across the street.

**RESPONSE:** Objection. Argumentative. Foundation. Self-serving. Vague. Compound. Not Concise. The record citation does not support the alleged statement of fact. Undisputed that LaWanda was placed in a marked cruiser and that Bonam drove her away from the Home. Disputed that LaWanda was escorted. Lydon, Schlotzhauer, and Bonam carried her to the cruiser. (Doc. 98-4, Pg. 45:23 - 46:10 | Doc. 101-3, Pg. 43:9-17). Disputed as to the crowd. The onlookers before LaWanda was taken into custody were a few neighbors recording the officers on their cell phones, and more

onlookers gathered after the officers entered the Home. (Doc. 101-1, Pg. 24-25).

36. Plaintiff was detained for obstructing a peace officer.

**RESPONSE:** Undisputed that LaWanda was eventually booked on the charge of obstructing a peace officer. Disputed that LaWanda was detained for obstructing a peace officer. (Doc. 98-4, Pg. 58:15-24). Bonam held LaWanda while he waited to learn from Rech "what her charge would be and if I was booking." (Doc. 98-4, Pg. 71:11 - 72:7). Disputed that LaWanda obstructed a peace officer. (Doc. 101-3, Pg. 33:4 - 34:16 | Doc. 101-4, Pg. 13:12-21, 18:9-13, 21:13-23).

37. Officer Bonam drove Plaintiff to a nearby church parking lot as a safety precaution.

**RESPONSE:** Objection. Argumentative. Foundation. Self-serving. The record citation does not support the alleged statement of fact. Undisputed that Bonam drove LaWanda to a church parking lot, where he held her, handcuffed, in the back of a locked cruiser. (Doc. 98-4, Pg. 55:13-24, 57:11-20).

38. Plaintiff was detained in the police cruiser for 33 minutes and 17 seconds before Officer Bonam transported Plaintiff to Douglas County Corrections facility.

**RESPONSE:** Undisputed in part and disputed in part. Undisputed that Bonam held LaWanda in the cruiser before transporting her to Douglas

County Corrections. Disputed as to the duration. Bonam testified that he held LaWanda in the cruiser for thirty to forty minutes or longer. (Doc. 98-4, Pg. 55:13-24, 57:11-20).

39. After Plaintiff was detained and transported away, officers conducted a protective sweep of the home to ensure no person was hiding inside.

**RESPONSE:** Undisputed in part and disputed in part. Undisputed that, with LaWanda in handcuffs, Rech, Lydon, and Schlotzhauer entered the Home without a warrant or consent, searched every room and closet, and found no one. (Doc. 101-3, Pg. 36:15 - 37:13 | Doc. 101-4, Pg. 22:15-17, 25:4-19). Disputed that only officers entered. Rech brought LaWanda's husband into the Home during the protective sweep without frisking him. (Doc. 101-4, Pg. 26:1-3, 29:11-14).

40. Officers then waited outside the home on the front porch with Mr. Williams for a search warrant to be completed.

**RESPONSE:** Undisputed in part and disputed in part. Undisputed that officers waited for the search warrant, which arrived about two hours later. (Doc. 101-4, Pg. 45:8-11). Disputed that officers remained outside. Rech went back inside the Home a second time without a warrant. (Doc. 101-4, Pg. 28:16 - 29:14).

41. After obtaining a search warrant, officers conducted a full search of the home.

**RESPONSE:** Undisputed.

42. Officers located the stolen phone a bedroom of the house.

**RESPONSE:** Objection. Hearsay. Speculation. Foundation. Undisputed that the video depicts cell phones.

43. Plaintiff was taken to Douglas County Corrections where she was booked and photographed by Omaha Police.

**RESPONSE:** Undisputed.

44. Plaintiff was booked into jail on the charge of Obstructing a Peace Officer, under NEB. REV. STAT. § 28-906.

**RESPONSE:** Undisputed.

## STATEMENT OF ADDITIONAL MATERIAL FACTS

45. All charges against Rico were dismissed. (Doc. 101-4, Pg. 46:6-10 | Doc. 101-5, Pg. 44:5-11).

46. When officers arrived, Rico was sitting on the front porch, outside the Home. (Doc. 101-3, Pg. 8:16-21, 10:5-7).

47. Rico was handcuffed and placed in a cruiser before Rech arrived. (Doc. 101-4, Pg. 7:23 - 8:11).

48. Rico was the only suspect. (Doc. 101-3, Pg. 21:1-3 | Doc. 101-4, Pg. 9:22 - 10:6).

49. LaWanda was never a suspect. (Doc. 101-3, Pg. 21:1-3 | Doc. 101-4, Pg. 9:22 - 10:6).

50. When Schlotzhauer arrived, she had no reason to believe LaWanda was committing a crime. (Doc. 101-5, Pg. 17:3-6).

51. No officer had an arrest warrant. (Doc. 101-4, Pg. 11:16-19).

52. Five officers were on scene before anyone entered the Home. (Doc. 101-3, Pg. 25:19-23).

53. The search warrant affidavit states that Ms. Brown "observed the residence until officers arrived" and identifies no one else who entered the Home. (Doc. 98-6, Pg. 2).

54. LaWanda and Rico told officers no one else was inside the Home. (Doc. 101-3, Pg. 18:19 - 19:2, 19:23 - 20:4).

55. Rech had no reason to believe anyone else was inside the Home. (Doc. 101-4, Pg. 10:23 - 11:15).

56. Rech testified, "We weren't looking for a suspect." (Doc. 101-4, Pg. 41:13-18).

57. No one reported that anyone inside the Home was hurt. (Doc. 101-3, Pg. 9:9-12, 19:14-22).

58. LaWanda refused consent to search the Home. (Doc. 101-3, Pg. 13:10-25, 17:18-23 | Doc. 101-4, Pg. 15:23 - 16:9).

59. LaWanda asked to see a warrant. (Doc. 101-3, Pg. 13:10-25, 17:18-23 | Doc. 101-4, Pg. 15:23 - 16:9).

60. The officers had no search warrant when LaWanda asked to see one. (Doc. 101-3, Pg. 13:10-25, 17:18-23 | Doc. 101-4, Pg. 15:23 - 16:9).

61. The search warrant affidavit states, "The owner was cooperative at first but when asked if officers could check the residence for a gun she became uncoopertive, denied officers consent, and refused to provide any further information." (Doc. 98-6, Pg. 2).

62. Schlotzhauer testified that the only reason LaWanda was kept out of her Home was "[b]ecause we were waiting on a warrant, and there was possible evidence in the house." (Doc. 101-5, Pg. 17:11-19).

63. Officers waited about fourteen minutes for a sergeant before entering the Home. (Doc. 101-5, Pg. 22:9 - 23:24).

64. Nothing about officer safety changed while officers waited for the sergeant. (Doc. 101-5, Pg. 23:17-24).

65. Rech did not ask LaWanda for consent to enter. (Doc. 101-4, Pg. 15:15-22).

66. Rech told LaWanda that officers were going into her Home. (Doc. 101-4, Pg. 15:15-22).

67. Rech testified that LaWanda was not uncooperative in any way other than not wanting officers in her Home without a warrant. (Doc. 101-4, Pg. 13:12-21).

68. Rech ordered LaWanda's arrest "[f]or not allowing us to perform a protective sweep." (Doc. 101-4, Pg. 21:13-23).

69. Rech testified: "In the end she believed that we couldn't go into her home without a warrant. That was the end of it. And once I couldn't get past that, I said, you're under arrest for obstructing." (Doc. 101-4, Pg. 18:9-13).

70. Bonam told internal affairs that LaWanda was arrested because she "refused to allow officers to go inside her residence." (Doc. 98-4, Pg. 62:1-23).

71. Bonam's booking narrative describes LaWanda as "adamant that officer's were not coming inside her residence to look for anything." (Doc. 98-2, Pg. 1).

72. LaWanda did not threaten anyone. (Doc. 98-4, Pg. 57:5-10 | Doc. 101-3, Pg. 22:11-16, 34:17-20 | Doc. 101-4, Pg. 19:24 - 20:2, 21:13-15 | Doc. 101-5, Pg. 30:8-12).

73. Lydon, who stood at the door, testified that LaWanda never put her hands on her and did not push her. (Doc. 101-3, Pg. 33:4 - 34:16).

74. Rech directed the officers to handcuff LaWanda. (Doc. 101-4, Pg. 21:7-9).

75. Lydon and Schlotzhauer handcuffed LaWanda while she stood on her porch. (Doc. 101-3, Pg. 37:21 - 38:8 | Doc. 101-4, Pg. 18:23-24).

76. Rech "did an underhook" and "forced . . . her left arm behind her back." (Doc. 101-4, Pg. 19:2-10).

77. LaWanda did not pull away when she was handcuffed. (Doc. 101-3, Pg. 38:9-24, 42:3-13).

78. LaWanda did not strike, "bite, scratch, claw, kick," or try to "spin away, run away, get away." (Doc. 101-3, Pg. 38:9-24, 42:3-13).

79. LaWanda lost her footing on the grass in her slippers. (Doc. 101-2, Pg. 69:19 - 72:7).

80. Rech directed the officers to pick LaWanda up off the lawn. (Doc. 101-4, Pg. 22:22 - 23:3).

81. LaWanda never refused a command to get up. (Doc. 101-2, Pg. 71:23 - 72:7).

82. Lydon, Schlotzhauer, and Bonam carried LaWanda across her lawn to the cruiser. (Doc. 98-4, Pg. 46:1-10, 50:11-21 | Doc. 101-2, Pg. 70:1-3, 71:1-8 | Doc. 101-3, Pg. 43:5-17 | Doc. 101-5, Pg. 34:25 - 35:1, 36:10-14).

83. LaWanda ended up on the ground while the officers were carrying her. (Doc. 101-5, Pg. 36:2-9).

84. LaWanda was physically injured because of the actions of the OPD Officers. (Doc. 101-2, Pg. 75:13-15).

85. LaWanda completed physical therapy for shooting pain down her left side. (Doc. 101-2, Pg. 75:13 - 76:17).

86. Bonam held LaWanda, handcuffed, in a locked cruiser for thirty to forty minutes or longer. (Doc. 98-4, Pg. 55:13-24, 57:11-20).

87. Bonam told internal affairs that he did “not really” have probable cause to detain LaWanda. (Doc. 98-4, Pg. 58:15-24).

88. Rech decided the charge against LaWanda. (Doc. 98-4, Pg. 71:11 - 72:7 | Doc. 101-4, Pg. 23:4-12, 33:7-10).

89. Bonam booked LaWanda for obstructing. (Doc. 98-4, Pg. 72:8-24).

90. LaWanda was jailed for roughly six hours. (Doc. 101-2, Pg. 74:7-19).

91. LaWanda borrowed $500 to post bond. (Doc. 101-2, Pg. 75:2-6).

92. All charges against LaWanda were dismissed. (Doc. 98-4, Pg. 74:1-3 | Doc. 98-5, Pg. 104:3-6).

93. Rech, Lydon, and Schlotzhauer entered the Home without a warrant. (Doc. 101-3, Pg. 36:15 - 37:13 | Doc. 101-4, Pg. 22:15-17, 25:4-19 | Doc. 101-5, Pg. 41:6-8).

94. Rech, Lydon, and Schlotzhauer entered the Home after LaWanda refused consent. (Doc. 101-3, Pg. 13:10-25, 36:15 - 37:13 | Doc. 101-4, Pg. 15:23 - 16:9, 22:15-17).

95. Rech, Lydon, and Schlotzhauer entered the Home while LaWanda was handcuffed. (Doc. 101-3, Pg. 36:15 - 37:13 | Doc. 101-4, Pg. 22:15-17).

96. Officers searched every room and closet in the Home without a warrant. (Doc. 101-3, Pg. 36:15 - 37:13 | Doc. 101-4, Pg. 25:4-19).

97. Officers found no one inside the Home. (Doc. 101-3, Pg. 47:1-4 | Doc. 101-5, Pg. 41:6-8).

98. Lydon, Schlotzhauer, and Knapp each testified that officers needed a warrant to enter the Home absent consent. (Doc. 98-5, Pg. 42:22 - 43:9 | Doc. 101-3, Pg. 17:14-17 | Doc. 101-5, Pg. 18:4-7).

99. Bonam testified that officers lacked authority to enter the Home without a warrant because "the house wasn't that type of a situation where they had to immediately go in." (Doc. 98-4, Pg. 63:9-21).

100. Rech described the entry as a sweep "in lieu of a court-authorized warrant." (Doc. 101-4, Pg. 42:11-16).

101. Rech testified that the entry "was just to find people in the residence. I wasn't worried about evidence." (Doc. 101-4, Pg. 14:2-13, 37:19-20).

102. Lydon testified, "We were not looking for the gun. We were looking for bodies." (Doc. 101-3, Pg. 37:14-16).

103. The Officers had no specific information or report establishing that anyone was in the Home. (Doc. 101-3, Pg. 19:14-22 | Doc. 101-4, Pg. 10:23 - 11:5, 11:11-15).

104. Mr. Williams told officers he owned a gun. (Doc. 101-3, Pg. 53:5-11).

105. Rech brought Mr. Williams into the Home during the protective sweep. (Doc. 101-3, Pg. 53:5-11 | Doc. 101-4, Pg. 26:1-3, 29:11-14).

106. Rech did not frisk Mr. Williams before bringing him into the Home. (Doc. 101-4, Pg. 29:11-14).

107. After the entry, Rech kept Mr. Williams out of the Home because of "allegations of a firearm being in the residence." (Doc. 101-4, Pg. 29:4-10).

108. Rech went back inside the Home a second time without a warrant. (Doc. 101-4, Pg. 28:16-19).

109. No OPD policy addresses bringing a civilian into a protective sweep. (Doc. 101-3, Pg. 49:23 - 50:1 | Doc. 101-4, Pg. 26:8-12).

110. Neither Rech nor Lydon had ever seen a civilian brought along on a protective sweep. (Doc. 101-3, Pg. 50:5-9 | Doc. 101-4, Pg. 26:13-15).

111. Talbitzer testified that no one else is allowed in during a sweep because anyone entering "could potentially pose a threat to those officers." (Doc. 101-6, Pg. 48:4-12).

112. Knapp testified that officers remove civilians from the area of a sweep because "having somebody in that area opens them up to a potential nonsafe situation." (Doc. 98-5, Pg. 93:12-24).

113. The gun found in the Home belonged to LaWanda's husband, and nothing about it was unlawful. (Doc. 101-4, Pg. 22:7-14).

114. Officers never found Rico's gun. (Doc. 101-4, Pg. 22:7-14).

115. The search warrant arrived about two hours after the entry. (Doc. 101-4, Pg. 45:8-11).

116. The search warrant authorized a search of the Home for the victim's cell phone and "[f]irearms and ammunition." (Doc. 98-7, Pg. 1).

117. Knapp testified that while a warrant is pending, "nothing changes," and officers secure the residence until the warrant is signed. (Doc. 98-5, Pg. 39:11-17).

118. The Domestic Violence Unit directed officers to conduct the sweep "in the process of getting the warrant." (Doc. 101-5, Pg. 16:13-16 | Doc. 101-6, Pg. 32:2-23).

119. Lydon testified that under OPD policy a sweep "is done typically" when "a search warrant's being written." (Doc. 101-3, Pg. 28:2-9, 28:25 - 29:7).

120. Knapp testified that officers sweep "before the warrant because otherwise you could be sitting there for hours." (Doc. 98-5, Pg. 61:19-23).

121. Rech told LaWanda's family that OPD had done protective sweeps "a hundred times." (Doc. 98, Exhibit 12 Officer Rech's Body Cam footage 0:10:06 | Doc. 101-1, Pg. 34).

122. OPD policy restricts no-knock warrants to cases where evidence may be destroyed or where knocking and announcing "would significantly compromise the safety of those involved." (Doc. 92-4, Pg. 15 | Doc. 98-5, Pg. 58:9-25).

123. The sworn search warrant application marked the no-knock request "N/A." (Doc. 98-6, Pg. 2).

124. The search warrant application did not seek a no-knock warrant because the City Defendants could not show that items sought can be easily or quickly disposed of or destroyed. (Doc. 98-6, Pg. 2).

125. The search warrant application did not seek a no-knock warrant because the City Defendants could not show that life or limb of an officer was in danger. (Doc. 98-6, Pg. 2).

126. Knapp and his sergeant decided a no-knock warrant was unnecessary. (Doc. 98-5, Pg. 47:13 - 48:3, 59:1-12).

127. Rech did not seek a no-knock warrant because "[i]t's going to take hours to get a no-knock search warrant." (Doc. 101-4, Pg. 35:6-19, 36:14-19).

128. OPD policy provides that officers "shall not make a warrantless and nonconsensual entry into a private residence . . . unless an exception to the warrant requirement exists." (Doc. 92-2, Pg. 32 | Doc. 98-5, Pg. 76:2-14).

129. OPD policy requires officers to "obtain a search warrant whenever time and circumstances permit." (Doc. 92-2, Pg. 32 | Doc. 98-5, Pg. 76:2-14).

130. OPD policy places the burden on officers who search without a warrant or an exception "to prove the search was reasonable." (Doc. 92-2, Pg. 32).

131. None of OPD's written policies mentions a protective sweep. (Doc. 92-2, Pg. 32-34 | Doc. 92-4, Pg. 15-18 | Doc. 98-5, Pg. 71:11 - 72:1, 75:12-21).

132. OPD's "Searches – Private Property and Residences" policy does not list a protective sweep among the exceptions to the warrant requirement. (Doc. 92-2, Pg. 32-34 | Doc. 98-5, Pg. 76:15 - 77:6).

133. Knapp testified that a protective sweep is "not officially in a policy." (Doc. 98-5, Pg. 71:11 - 72:1).

134. Rech could not identify any OPD policy on protective sweeps. (Doc. 101-4, Pg. 39:18 - 41:1).

135. OPD's search warrant policy authorizes a "preliminary search for any persons who may be hiding" only "[w]hen the search site premises are secured" during execution of a search warrant. (Doc. 92-4, Pg. 18, ¶ K.1 | Doc. 101-4, Pg. 36:20 - 37:16 | Doc. 101-5, Pg. 46:8-13).

136. OPD policy requires officers who wish to search a third party's residence for a suspect to "either obtain permission to search or a search warrant." (Doc. 101-1, Pg. 31 | Doc. 101-4, Pg. 41:7 - 42:16).

137. OPD policy requires a Chief's Report whenever officers search private property "without a warrant and without consent." (Doc. 101-1, Pg. 31 | Doc. 101-4, Pg. 41:7 - 42:16).

138. No Chief's Report was prepared. (Doc. 101-4, Pg. 42:2-10).

139. Rech had no training on protective sweeps. (Doc. 101-4, Pg. 33:14-21).

140. Knapp could not identify any OPD training on protective sweeps. (Doc. 98-5, Pg. 71:11 - 72:1, 73:12-15).

141. OPD internal affairs exonerated the officers on the stated basis that the sweep was "for officer safety and the preservation of evidence." (Doc. 101-6, Pg. 51:6 - 54:7).

142. Rech admitted that he "could" have cited LaWanda instead of arresting her. (Doc. 101-4, Pg. 24:1-8).

143. OPD policy directs officers to issue citations in lieu of arrest "to the maximum extent consistent with the effective enforcement of the law and the protection of the public." (Doc. 92-4, Pg. 35, ¶ VIII).

144. OPD's use of force policy directs officers to "use only that amount of force which is objectively reasonable to take a subject into custody." (Doc. 92-4, Pg. 19-20, 22).

145. OPD's use of force policy directs officers to weigh "[t]he seriousness of the crime" and "[t]he level of threat or resistance presented by the subject." (Doc. 92-4, Pg. 19-20, 22).

146. OPD's use of force policy provides that "[t]he officer's response will use the least amount of force necessary to control the subject." (Doc. 92-4, Pg. 21-22, 25).

147. Under OPD's use of force policy, a person who "fail[s] to complete a physical action upon lawful direction" but "offers no physical resistance" is a "Passively Resistive Subject." (Doc. 92-4, Pg. 26).

148. Retired police chief Thomas J. Tiderington ("Tiderington") is LaWanda's police practices expert. (Doc. 101-1, Pg. 6-7).

149. Tiderington concluded that a reasonably trained officer "would not have entered the residence or conducted a protective sweep prior to the issuance of a court ordered and authorized warrant to search." (Doc. 101-1, Pg. 24).

150. Tiderington concluded that bringing an unsearched civilian into the Home indicates "the officers themselves did not treat the residence as presenting the kind of danger they later described." (Doc. 101-1, Pg. 27).

151. Tiderington concluded that the decision not to seek a no-knock warrant "strongly suggests that [the officers] themselves did not believe the

circumstances presented an imminent threat to officer safety or an immediate risk that evidence would be destroyed." (Doc. 101-1, Pg. 30).

152. Tiderington concluded that "insistence on a warrant, or refusal to consent to a search does not, without more, create probable cause for an obstruction arrest." (Doc. 101-1, Pg. 33).

153. Tiderington found "no reliable evidence that [LaWanda] attempted to flee, threatened officers, assaulted officers, or otherwise engaged in conduct that materially prevented them from carrying out a lawful police function." (Doc. 101-1, Pg. 33).

154. Tiderington concluded that the City "failed to properly train and supervise its officers with respect to fundamental police practices principles governing warrantless entries, protective sweeps, and the reporting and accountability requirements associated with such actions." (Doc. 101-1, Pg. 33-35).

155. Tiderington concluded that those training and supervision deficiencies were "a moving force behind the violations that occurred in this case." (Doc. 101-1, Pg. 33-35).

LaWanda Valentine-Williams, Plaintiff,

By: *<u>/s/ Jason M. Bruno</u>*
Jason M. Bruno, NE #23062
Diana J. Vogt, NE #19387
SHERRETS BRUNO & VOGT LLC

260 Regency Parkway Drive, St. 200
Omaha, NE 68114
(402)390-1112 Telephone
(402)390-1163 Facsimile
law@sherrets.com
ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court for the United States District Court for the District of Nebraska using the CM/ECF system on this 26th day of November 2026, which system sent notification to counsel of record.

*/s/ Jason M. Bruno*